### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

MILLERKING, LLC, on behalf of itself,
and all others similarly situated,

       Plaintiff,

v.

DONOTPAY, INC.,

       Defendant.

Case No. 3:23-CV-863-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This case pits real lawyers against a robot lawyer. Defendant DoNotPay, Inc. ("DNP"), is an online subscription service that touts its robot lawyer's ability to allow consumers to "[f]ight corporations, beat bureaucracy and sue anyone at the press of a button." But, DNP and its robot lawyer are not actually licensed to practice law. So, Plaintiff MillerKing, Inc. ("MK"), a small Chicago law firm that claims to be a direct competitor of DNP, has sued DNP for false association and false advertising under the Lanham Act and Illinois state law.

Now pending before the Court is DNP's motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Doc. 20). DNP essentially asks MK, in the words of Justice Antonin Scalia, "What's it to you?" More precisely, how has DNP's conduct injured MK such that it has standing under Article III of the U.S. Constitution to sue DNP in federal court? This Court finds that MK has not adequately alleged such an injury and, thus, its complaint must be dismissed for lack of standing.

JURISDICTION

MK brings this case as a putative class action under the Class Action Fairness Act

("CAFA"), 28 U.S.C. § 1453(c). Under CAFA, federal courts have jurisdiction to hear a class action if the proposed class has more than 100 members, the parties are minimally diverse, and the amount in controversy exceeds $5 million. *Sudholt v. Country Mut. Ins. Co.*, 83 F.4th 621, 625 (7th Cir. 2023) (citing 28 U.S.C. § 1332(d)(2), (d)(5)(B)).

Normally, the Court considers a limited liability company's citizenship to be the citizenship of its members for purposes of diversity jurisdiction. *See Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998) ("[T]he citizenship of an LLC for purposes of the diversity jurisdiction is the citizenship of its members."). Under CAFA, however, "an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332(d)(10); *see also Calchi v. TopCo Assocs., LLC*, No. 22-CV-747, 2023 WL 3863355, at *6 (N.D. Ill. June 7, 2023) (explaining that under CAFA, an unincorporated association such as an LLC is a citizen of its state of organization and the state where it has its principal place of business); *Lewis v. loanDepot.com, LLC*, No. 20 C 7820, 2021 WL 5038779, at *2 (N.D. Ill. Oct. 29, 2021) (same); *Havron v. AT&T, Inc.*, No. CIV. 09-1040-GPM, 2009 WL 5030760, at *2 n.2 (S.D. Ill. Dec. 16, 2009) ("The provision of the CAFA dealing with the citizenship of unincorporated associations, such as LLCs, is a legislative repeal, of course, of the familiar federal common-law rule that the citizenship of an unincorporated association for diversity purposes is the citizenship of each of the association's members.").

MK is an Illinois LLC with its principal place of business in Illinois. (Doc. 1 at ¶¶ 7-8). DNP is a Delaware corporation with its principal place of business in Colorado. (*Id.* at ¶ 9; Doc. 21 at p. 8). Thus, the Court finds that the parties are minimally diverse under CAFA. Further, MK has alleged that there are at least 100 class members, and the total claims exceed

$5,000,000 exclusive of interest and costs. (*Id.* at ¶ 11). Accordingly, the Court has CAFA jurisdiction over the claims in this case.

BACKGROUND

The following facts are derived from MK's class-action complaint, which the Court accepts as true for the purposes of DNP's motion to dismiss. MK, a six-attorney law firm, "advertises its services online and provides legal services across various practice areas including personal injury, wrongful death, family law, divorce law, child custody, criminal law, traffic law, estate planning, probate, workers' compensation, business law, municipal law, and mediation." (Doc. 1 at ¶ 8).

DNP is an online subscription service that uses artificial intelligence to provide a variety of legal services, although it is not licensed to practice law and does not employ licensed attorneys. (*Id.* at ¶ 2). Billing itself as "The World's First Robot Lawyer," DNP's website offers legal services related to marriage annulment, speeding ticket appeals, canceling timeshares, breaking leases, breach of contract disputes, defamation demand letters, copyright protection, child support payments, restraining orders, revocable living trusts, and standardized legal documents. (*Id.* at ¶ 27). Customers pay $36 for two months of service, which is renewed automatically. (*Id.* at ¶ 26).

DNP offers to perform legal work for its clients "behind the scenes" using "artificial intelligence" rather than "human knowledge." (*Id.* at ¶ 29). For example, by clicking on "Standardized Legal Documents," a user is directed to a webpage titled "The Best Contract Template at Your Disposal." (*Id.* at ¶ 32). The user can then use DNP to generate a personalized contract. (*Id.* at ¶ 33). Other personalized legal documents DNP offers to generate include independent contractor agreements, non-disclosure agreements, bills of

sale, prenuptial agreements, LLC operating agreements, promissory notes, and parenting plans. (*Id.* at ¶ 34).

In addition to legal documents, DNP advertises that it will provide advice on property tax appeal procedures, create customized property tax guides, provide advice on how to appeal traffic tickets in any city, provide services to initiate litigation and obtain a judgment, and guide users through the process of filing a court case. (*Id.* at ¶¶ 40-44). If a subscriber wants to file a lawsuit for over $500, DNP states that it "can generate demand letters, court filings and give you a script to read in court." (*Id.* at ¶ 46).

DNP claims to have taken on hundreds of thousands of parking ticket cases and overturned $4 million in parking ticket fines. (*Id.* at ¶¶ 52-54). By June 2021, DNP had "attracted numerous investors, doubled its valuation to about $210 million, and had approximately 250,000 subscribers." (*Id.* at ¶ 57). A year later, DNP's Founder and CEO, Joshua Browder, stated that DNP had initiated more than 1,000 small claims lawsuits against a single company in 42 states. (*Id.* at ¶ 58). As of January 2023, Browder claimed that DNP had "processed over 2 million cases" and touted that DNP's "robot lawyer" would soon represent someone in a courtroom by whispering in the person's ear exactly what to say. (*Id.* at ¶¶ 50, 59). Shortly thereafter, Browder announced that DNP would postpone its plan to bring AI into the courtroom because of "threats from State Bar prosecutors." (*Id.* at ¶ 68).

Several subscribers have posted poor online reviews of DNP due to its failure to perform as advertised. (*Id.* at ¶¶ 60-61). For example, DNP has failed to dispute parking tickets as requested, has created inadequate legal documents, or has included inaccurate information in its forms. (*Id.* at ¶¶ 60-62). MK alleges these mistakes could subject DNP's subscribers to statute of limitations issues, or worse, civil or criminal liability. (*Id.* at ¶ 63).

By the end of January 2023, DNP had removed some products from its website, though it continued to advertise and promote legal products and services including defamation demand letters, divorce certificates, divorce settlement agreements, and numerous other categories of legal services. (*Id.* at ¶¶ 71-73).

On March 15, 2023, MK filed this lawsuit on behalf of itself and a proposed class of "All law firms in the United States in existence during the Class Period." (*Id.* at ¶ 74). MK also proposes a subclass of "All law firms that, at any time during the Class Period, were registered with the Illinois Supreme Court to practice law in Illinois." (*Id.* at ¶ 75).

In Count I, MK alleges a violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), for False Affiliation, Connection, Association, Sponsorship, or Approval. Specifically, MK alleges that (1) it is a direct competitor of DNP and that (2) DNP made numerous representations[1] that create the false impression that DNP is affiliated with licensed attorneys and that State bar authorities approve of or sponsor DNP's services. (*Id.* at ¶¶ 92-93). MK alleges that it and the class has been or is likely to be injured, either by direct diversion of clients from themselves to DNP or by a lessening of the goodwill associated with their goods and services. (*Id.* at ¶ 95).

In Count II, MK asserts a violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), for False Advertising. MK claims DNP falsely represented that its legal services and products would be offered by a robot "lawyer" and "attorney," which likely influenced subscribers' purchasing decisions. (*Id.* at ¶ 107). These false statements misrepresented DNP's goods and

---

[1] MK alleges DNP's representations include descriptions that, among many other things: it provides legal services "behind the scenes," it will provide the "best advice," it will "assist with all your legal needs" in "small claims and more," it can be used to appeal traffic tickets "in any city," it will "generate . . . court filings," it will provide a "script to read in court"; it would represent a person in a courtroom; it sent out a subpoena; and it has taken on hundreds of thousands of parking ticket cases. (Doc. 1 at ¶ 89).

services, as DNP is not licensed to perform legal work. (*Id.* at ¶ 108). Again, MK contends that it and the class has been or is likely to be injured by the false representations, either by direct diversion of clients from themselves to DNP or by a lessening of the goodwill associated with their goods and services. (*Id.* at ¶ 110).

In Count III, MK brings a state law claim on behalf of itself and the subclass for DNP's violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.* ("IUDTPA"). (*Id.* at ¶ 119). MK claims DNP violated the IUDTPA when it caused confusion or misunderstanding by misrepresenting its affiliation, sponsorship, and the quality of its goods and services. (*Id.*). MK asserts that it and the subclass members "are likely to be damaged by Defendant's deceptive trade practices" and that they "face of risk of future harm with no adequate legal remedy." (*Id.* at ¶¶ 123-24).

Finally, Count IV alleges the Unauthorized Practice of Law in Illinois on behalf of MK and the subclass. MK claims DNP has violated the Illinois Attorney Act, 705 ILCS 205/1, and the Corporation Practice of Law Prohibition Act, 705 ILCS 220/1 and 705 ILCS 220/2, by engaging in the practice of law without a license from the Illinois Supreme Court. (*Id.* at ¶¶ 128-29). MK asserts DNP's conduct is causing "irreparable harm to many citizens, as well as to the judicial system itself," and "constitutes an infringement upon the rights of those who are properly licensed, [including] attorneys and law firms. MK seeks an injunction to prevent DNP from continuing in the unlawful and unauthorized practice of law.

As relief, MK seeks certification of the class and subclass, an injunction precluding DNP from continuing its unlawful activities and ordering it to engage in a corrective advertising campaign, and disgorgement of DNP's profits. MK also asks the Court to find DNP in contempt of court, assess a civil penalty to be paid to the Illinois Equal Justice

Foundation, and an award of costs, attorneys' fees, and interest.

DNP moves to dismiss the Class Action Complaint with prejudice pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, arguing primarily that MK lacks Article III standing and statutory standing under the Lanham Act to bring its claims in federal court. (Doc. 21). MK filed a response in opposition (Doc. 32), and DNP filed a timely reply (Doc. 33).

## LEGAL STANDARD

A court facing a challenge to subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) must determine whether the party is raising a facial or factual challenge. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). A factual challenge alleges that, even if the pleadings are sufficient, there is no basis for subject matter jurisdiction. *Id.* A facial challenge, on the other hand, argues the plaintiff has not sufficiently pleaded a basis for subject matter jurisdiction. *Id.* "In reviewing a facial challenge, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Id.*

Because DNP argues that MK has not sufficiently alleged a basis for standing in federal court, it has raised a facial challenge to subject matter jurisdiction. In the Seventh Circuit, "when evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use *Twombly–Iqbal*'s 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6). *Id.* at 174 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). That is, the court must determine whether the plaintiff's complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 173. In doing so, a court "(1) first identifies the well-pleaded factual allegations by discarding the pleadings

that are 'no more than conclusions' and (2) then determines whether the remaining well-pleaded factual allegations 'plausibly give rise to an entitlement of relief.'" *Id.* at 174 (quoting *Iqbal*, 556 U.S. at 679).

## DISCUSSION

## I.     Article III Standing

Article III of the Constitution limits federal courts to resolving "Cases" and "Controversies," which is understood as restricting the courts to their "constitutionally limited role of adjudicating actual and concrete disputes" in a form that is appropriate for judicial decision and the resolution of which "will have direct consequences on the parties involved." *Nabozny v. Optio Sols. LLC*, --F.4th--No. 22-1202, 2023 WL 6967048, at *2 (7th Cir. Oct. 23, 2023) (quoting *Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013)).

"An essential component of the case-or-controversy limitation is the requirement that a plaintiff have standing to sue—that is, a 'personal stake' in the outcome of the suit sufficient to engage the jurisdiction of the federal court." *Id.* To demonstrate that personal stake, "plaintiffs must be able to sufficiently answer the question: 'What's it to you?'" *TransUnion LLC v. Ramirez*, 594 U.S. ----, 141 S. Ct. 2190, 2203 (2021) (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 SUFFOLK U. L. REV. 881, 882 (1983)). Without Article III standing, federal courts have no authority to resolve a case for want of subject matter jurisdiction. *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 581 (7th Cir. 2019); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016).

To establish standing, a plaintiff must show "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial

relief." *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1244 (7th Cir. 2021) (quoting *Thole v. U.S. Bank N.A.*, 590 U.S. –––, 140 S. Ct. 1615, 1618, 207 L.Ed.2d 85 (2020)).

A "concrete" injury is one that is real, not abstract, and a "particularized" injury is one that affects the plaintiff personally. *Crabtree v. Experian Info. Sols., Inc.*, 948 F.3d 872, 877 (7th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). An injury must be actual or imminent, not conjectural or hypothetical. *Id.* "Without 'an injury that the defendant caused and the court can remedy, there is no case or controversy' under Article III." *Nabozny*, 2020 WL 6967048, at *2 (quoting *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019)). As the Supreme Court recently put it, "[n]o concrete harm, no standing." *TransUnion LLC*, 141 S. Ct. at 2200.

The most obvious forms of "real" injuries include monetary and physical damages caused by a defendant, but a concrete harm can also be intangible. *Id.* at 2204; *Nabozny*, 2020 WL 6967048, at *2. Intangible harms can include reputational harms, invasion of privacy, and other "harms specified by the Constitution itself" like abridgement of free speech. *Id.* Courts must also defer to Congress's decision "to grant a plaintiff a cause of action to sue over a defendant's violation of a statutory prohibition or obligation." *Id.* at 2205. However, "[i]dentifying a violation of a statutory right does not automatically equate to showing injury-in-fact for standing purposes." *Crabtree*, 948 F.3d at 877. A plaintiff must still demonstrate a concrete injury even in the context of a statutory violation. *Spokeo*, 578 U.S. at 341. "[A]n injury in law is not an injury in fact." *TransUnion LLC*, 141 S. Ct. at 2205.

Because MK is the party invoking federal jurisdiction, it bears the burden of demonstrating standing for each of its claims and requests for relief. *Id.* at 2207-08 ("[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each

claim that they press and for each form of relief that they seek (for example, injunctive relief and damages).").

In Counts I and II, MK asserts violations of the Lanham Act, claiming that DNP's false representations about its products and services are likely to confuse and deceive consumers. As a result, MK and the class have been or are likely to be injured by the direct diversion of clients from themselves to DNP or by a lessening of the goodwill associated with MK and the class's goods and services. In Count III, MK alleges DNP's false representations also violate the IUDTPA and that it and the class are "likely to be damaged" by DNP's deceptive trade practices. Finally, in Count IV, MK asserts DNP's unauthorized practice of law without the requisite expertise, competence, and licensure requirements causes irreparable harm to many citizens in need of legal services and infringes on the rights of law firms employing those who are properly licensed—particularly small law firms whose services overlap with those offered by DNP.

These allegations are insufficient to establish Article III standing. As argued by DNP, MK has not alleged any lost revenue or added expenditures as a result of DNP's conduct. Nor has it alleged that any client or prospective client has withheld business, has considered withholding business, or has even heard of DNP. For example, while the complaint references the hundreds of thousands of parking ticket cases that DNP claims to have taken on, there is no allegation that those customers originally were clients of MK, had considered hiring MK, or would have sought the advice of any law firm in the first place if not for the representations made by DNP.

MK also has not presented facts to support its claim that DNP has hurt its reputation or lessened its goodwill. While the complaint asserts that DNP has provided poor customer

service at times, leading to adverse legal consequences for DNP's customers, the complaint fails to cite any instance where DNP's failures were imputed to MK specifically or lawyers generally. *See Crabtree*, 948 F.3d at 880 ("It is not enough to say that your reputation was harmed without explaining how."). In *Crabtree*, the Seventh Circuit found that the defendant counterclaimant failed to demonstrate Article III standing when its counterclaim pointed to no factual allegations demonstrating how its goodwill was tarnished, its future business prospects were affected, or its position as a major consumer reporting agency was lessened by plaintiff's conduct. *Id.* In other words, it had failed to allege an injury sufficient to confer Article III standing. The same is true here.

MK cites to *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, to argue that, as a "direct competitor" of DNP, its general allegations of lost sales or damages to its business reputation arising from DNP's illegal competition is enough to confer Article III standing on its Lanham Act claims. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). In *Lexmark*, the plaintiff, Lexmark, sold both new and refurbished toner cartridges. *Id.* at 121. Other companies, known as "remanufacturers," also sold refurbished Lexmark toner cartridges. *Id.* Lexmark, in an effort to encourage customers to return their cartridges to Lexmark for refurbishment rather than to "remanufacturers," introduced a "Prebate" program that enabled customers to purchase new cartridges at a 20 percent discount if they agreed to return the toner cartridge to Lexmark. *Id.* Customers assented to the terms of the Prebate program by opening the toner package. *Id.* Lexmark also installed a microchip in each cartridge that would disable the cartridge after it ran out of toner, requiring the microchip to be replaced by Lexmark. *Id.* Defendant and counterclaimant, Static Control, while not a remanufacturer itself, made and sold the components necessary to remanufacture

the Lexmark cartridges—including a microchip that could mimic Lexmark's microchip. *Id.*

Lexmark sued Static Control for copyright violations, and Static Control countersued for violations of the Lanham Act. *Id.* at 122. Static Control alleged that Lexmark engaged in false or misleading advertising when (1) its Prebate program misled consumers to believe they were legally bound to return toner cartridges to Lexmark after a single use; and (2) it sent letters to companies in the toner cartridge remanufacturing business falsely indicating it was illegal to use Static Control's products to refurbish its toner cartridges. *Id.* at 122-23. Static Control claimed that Lexmark's actions had proximately caused it injury by "diverting sales from Static Control to Lexmark" and had "substantially injured [its] business reputation" by "leading consumers and others in the trade to believe" that Static Control had "engaged in illegal conduct." *Id.* at 123. While the issue of Article III standing was not before the Supreme Court, the Court was satisfied that Static Control's allegations of injury presented an Article III case or controversy. *Id.* at 125.

Unlike MK, Static Control not only alleged injury due to diversion of sales and reputational harm, but it also provided the facts necessary to make those allegations plausible. Static Control alleged Lexmark directly targeted its customers and falsely stated that doing business with Static Control was illegal. These facts are sufficient to state a concrete, particularized, and actual injury. MK's general allegations that DNP has caused a diversion of clients and loss of goodwill, on the other hand, are not.

MK nevertheless argues that a plaintiff's lost sales or loss of goodwill can be *inferred* without specific allegations when the plaintiff pleads false or misleading representations by a "direct competitor" about its products. DNP disputes that it is a "direct competitor" of MK, given that it cannot represent a client in court, meet with a client to discuss a case, offer

advice, negotiate with opposing counsel, review documents, take depositions, or provide any of the other legal services that a licensed law firm can provide. Nor does MK purport to solely use AI to generate documents for its clients "automatically," which DNP allegedly does. Thus, while the two parties work within similar industries, DNP argues, MK has not plausibly alleged that the two are direct competitors such that MK's conclusory allegations of harm suffice to plead Article III standing.

Even if the Court were to find that MK (a law firm) is a "direct competitor" of DNP (an AI-based legal subscription service), MK has conflated the injury requirement for a statutory cause of action under the Lanham Act claim with Article III's injury-in-fact requirement, as evidenced by the cases it cites. *See Chaverri v. Platinum LED Lights LLC*, No. CV-21-01700-PHX-SPL, 2022 WL 2275664, at *6 (D. Ariz. June 22, 2022) ("Although [the] allegations as to lost sales are vague and conclusory in nature, the direct competitive relationship between Platinum and Mito Red gives rise to a presumption of commercial injury sufficient to establish standing *under the Lanham Act*.") (emphasis added); *Benshot, LLC v. Lucky Shot USA LLC*, 2019 U.S. Dist. LEXIS 21343, at *10 (E.D. Wis. Feb. 8, 2019) (allegations that competitor falsely represented that its product was made in the USA and that consumers placed high value on "buying American" was sufficient to allege injury and state a *statutory cause of action*) (emphasis added).

The Lanham Act provides a cause of action to a competitor who "is or is likely to be damaged by" the defendant's false advertising or false association. 15 U.S.C. 1125(a). But "Article III standing requires a concrete injury even in the context of a statutory violation." *TransUnion*, 141 S. Ct. at 2205 (quoting *Spokeo*, 578 U. S. at 341). "The question whether a plaintiff has satisfied the elements of a Lanham Act claim is a merits issue that has 'nothing

to do with [the] plaintiff's standing to sue under Article III of the U.S. Constitution . . . .'" *Jiaxing Zichi Trade Co. v. Yang*, No. 21-CV-973, 2021 WL 4498654, at *1 (N.D. Ill. Aug. 19, 2021) (quoting *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018)).

MK's reliance on *Vital Proteins* is similarly unpersuasive. There, Vital Proteins, LLC ("Vital"), sued Ancient Brands, LLC ("Ancient"), for false advertising and unfair competition under the Lanham Act and Illinois law. *Vital Proteins LLC v. Ancient Brands, LLC*, No. 22 C 02265, 2023 WL 157956, at *1 (N.D. Ill. Jan. 11, 2023). It was undisputed that Vital and Ancient were "direct competitors" selling nearly identical collagen peptide nutritional supplements. *Id.* at *2. Vital alleged that Ancient made false statements on its product labels and advertising materials related to its ability to work within 24 hours and the composition of its ingredients. *Id.* at **1-2. Ancient moved to dismiss Vital's lawsuit, arguing that Vital's allegations of injury were conclusory, speculative, vague, and devoid of factual support. *Id.* at *2.

The district court, with no citation to precedent and while discussing Article III standing and statutory standing simultaneously, found that Vital sufficiently pleaded Article III standing because the parties did not dispute that they were direct competitors selling the same product, and a consumer looking for the more effective supplement may conclude that Ancient's products are superior due to Ancient's false statements about its product's efficacy. *Id.* Based on these allegations, the court found that it was reasonable to infer that Ancient's false representations would result in lost sales for Vital. *Id.* at *2.

Here, MK argues that it and DNP are direct competitors in that they both offer legal services in the same legal practice areas. But unlike *Vital Proteins*, where both parties sold nearly identical collagen peptide nutritional supplements, the products here are different.

Page 14 of 16

MK is a law firm employing real, licensed attorneys who appear in court before judges, represent clients, make legal arguments, and sign legal documents. MK claims to advertise its services online, but it does not provide those services online. DNP is a web-based company purporting to use AI to provide legal services virtually. In other words, while the parties participate in similar industries, they are not selling identical products. Therefore, MK's argument that the parties are "direct competitors" fails, and the Court will not presume a commercial injury for purposes of Article III standing.

In further support of its argument that the Court can infer harm, MK also contends that DNP has experienced a strong and rapid increase in its valuation and subscribers, making it "more plausible" that it has suffered commercial injury. The Seventh Circuit has held, however, that "that a plaintiff's claim of injury in fact cannot be based solely on a defendant's gain; it must be based on a plaintiff's loss." *Silha*, 807 F.3d at 174-75. Again, the Court will not infer that MK has suffered harm through lost clients just because DNP has gained them.

MK also avers that its allegation of "literally false" statements by DNP, *e.g.*, that it is a "lawyer" and "attorney," that it provides "legal services," and that it has "represented people" in legal disputes, presumptively causes direct competitors like MK harm. Again, MK has not plausibly alleged that it and DNP are direct competitors, nor has it explained how these "literally false" statements have caused it any harm. While the parties may work in similar industries, the services they provide are different enough that the Court will not infer an injury based on these statements.

Finally, the Court notes that MK seeks an injunction in Counts III and IV to preclude DNP from continuing its unlawful activities. As discussed above, a plaintiff bears the burden

of demonstrating standing for each claim they bring forth and each form of relief that they seek. *TransUnion LLC*, 141 S. Ct. at 2205. Unlike a claim for damages, the standing requirement for injunctive relief may be satisfied by a risk of future harm, "so long as the risk of harm is sufficiently imminent and substantial." *Id.* at 2197. MK has not sufficiently alleged *any* imminent harm that will occur if DNP is not enjoined from its conduct. Thus, it also lacks Article III standing to bring a claim for injunctive relief.

In sum, MK has not plausibly alleged that it has suffered a diversion of clients or reputational harm as a result of DNP's actions. Thus, it lacks Article III standing to pursue its Lanham Act claims. And because an IUDTPA claim is analyzed using the same standards as a claim under the Lanham Act, MK also lacks standing to bring its IUDTPA claim in Count III. The same can be said for MK's claim in Count IV that DNP has engaged in the unauthorized practice of law in Illinois, where MK has alleged no particularized harm to it whatsoever.

## CONCLUSION

For these reasons, the Motion to Dismiss filed by Defendant DoNotPay, Inc. (Doc. 20) is **GRANTED** and the Complaint (Doc. 1) is **DISMISSED without prejudice**. Plaintiff MillerKing, LLC, is granted leave to file an amended complaint on or before **December 18, 2023**. The failure to do so will result in the dismissal of this action with prejudice.

**IT IS SO ORDERED.**

**DATED:   November 17, 2023**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**